All rise. This court is now in session. Please be seated. Madam Clerk, your case. 317-0110, Zachary Upton, added by Lewis Newell, v. Abby Twomey, a.k.a. Abby Bigley, is found by Kelly Gerardo. Please proceed. Good afternoon. May it please the Court, opposing counsel? My name is Kelly Gerardo and I represent the appellant in this case, Abby Twomey, now known as Abby Daly. The issue before you today is whether the circuit court erred in denying Abby's petition to relocate minor child when the evidence clearly establishes that relocation is in the minor child's best interest. When all factors set forth in Section 609.2 of the Illinois Marriage and Dissolution of Marriage Act are considered and weighed properly, the evidence presented to the circuit court in this case clearly establishes that relocation to North Carolina is in Jeff's best interest. The circuit court's ruling was against manifest weight of the evidence and must be reversed. It is important to note that the Illinois Supreme Court tells us in the Ecker case that a determination of the best interest of a minor child cannot be reduced to a simple bright-line test, but rather must be made on a case-by-case basis, depending to a great extent on the specific circumstances of each case. In the instant case, first, when addressing the circumstances and reasons that Abby's requesting relocation, the circuit court failed to recognize the substantial indirect benefit that Jett will derive from the enhancement of Abby's life by the relocation to North Carolina. Second, the circuit court failed to properly consider the history and quality of each parent's relationship to the child by minimizing the fact that Abby has been Jett's primary caretaker and sole decision-maker since his birth, with minimal participation by Zach other than the agreed-upon parenting time allotted to him. Third, the circuit court erred by finding that a reasonable parenting time schedule must be established that maintains Zach's current level of involvement with Jett. And finally, the circuit court failed to properly analyze the facts with regard to the presence and absence of extended family  In addition, Zach presented no evidence to the circuit court that establishes that Jett would be disadvantaged or harmed by a change in contact with his extended family. Jett will derive a substantial indirect benefit from the enhancement of Abby's life by relocating to North Carolina to reside with her husband, Kyle, the minor child, Jett, and their infant daughter, Vera. The Illinois Supreme Court tells us in Collingborn, which is similar to the case at hand, that a circuit court must consider the proposed move in terms of the likelihood for enhancing the general quality of life for both the child and the custodial parent. The best interest of a child can't be easily severed from the interest of the custodial parent with whom the minor child resides and whose mental and physical well-being the child primarily depends. Because the principal burden and responsibility of child-rearing falls upon the custodial parent, there's a palpable nexus between the custodial parent's quality of life and the child's quality of life. Collingborn set forth that some deference is due to the custodial parent, who has already determined that the best interest of herself and her child are served by the removal, or as it's now called, relocation. This court ruled in Shinobi-Carter that a custodial parent who is seeking court approval to remove the child from the estate must prove more than his or her own desire to live with a new spouse. The instant case is very similar to Shinobi-Carter, but with a few important distinctions. The mother's new marriage in that case was her third serious relationship in six years, after having one child with a former spouse and a child with the father of that case. The mother married her husband after knowing him for only ten months. This court found that that evidence points to the indisputable conclusion that the mother was somewhat impulsive. Based on the evidence presented, the mother's argument that the minor child's quality of life would be enhanced was little more than speculation. Nothing introduced in this case suggests that Abby is impulsive, and the evidence does prove more than just a desire to live with her new spouse. Abby began a relationship with Kyle in May of 2013, when Jet was only four months old. They became engaged in August of 2015, married in August of 2016, and Abby just gave birth to their minor daughter, Vera, in May of 2017. Kyle is in the military. He is stationed at Camp Lejeune. He does not have the ability to up and move to Illinois to reside with Abby. Abby wishes to move Jet to North Carolina to reside with her husband, who is the one and only love of her life, and their infant daughter, Vera. She intends to work as a nurse in North Carolina, just as she has in Peoria, where she would enjoy an intact two-income home in a desirable location with a partner to help her in child-rearing. It's anticipated that Abby's income would be comparable to her income here in Illinois, therefore putting the combined household income at approximately $116,500. Zach was previously married, and he has a child from that marriage. Zach has been able to reside with his current fiancée and her children in a two-parent home. He understands having the support of another adult in the household. Having a child with Abby has not limited his ability to fall in love again and create the family environment that he enjoys today. Abby now seeks to enjoy the same traditional environment. However, she is only able to provide that to Jet if the court allows her to relocate. The Illinois Supreme Court noted in Collingborn that the creation of a new family unit in the social environment of a traditional family setting may be considered a substantial benefit to the child. Allowing Abby to relocate would have some effect on everyone involved. However, the initial disruption caused by that move would be outweighed by the benefits resulting to Jet from the move. The circuit court in this case found that Abby wants to move to North Carolina to start a family with her husband. But Abby's intentions are so much more than that. By granting Abby permission to move Jet to North Carolina, she can be with her husband, raise Jet and his baby sister in a two-parent traditional family environment, provide greater financial security to the family, enroll Jet in a school system with comparable education and extracurricular opportunities, and afford transportation and regular electronic contact, allowing Jet to continue the relationship that he had with Zach before the move. The circuit court minimized the fact that Abby has been Jet's primary caretaker since his birth, with minimal participation by Zach other than the agreed-upon parenting time allotted to him. There is so much more to parenting than exercising parenting time. There are major responsibilities that are required to parent a child, and Abby has taken on most of those responsibilities without help from Zach. This should not be minimized. To the contrary, it should be given substantial weight. It is undisputed that both parents have a good relationship with Jet. The circuit court found it to be good and outstanding. It cannot be ignored, though, that Abby has been the primary caretaker and decision-maker. Zach did not become involved with Jet until he was approached by Abby to take a paternity test when Jet was about three months old. He did not begin overnight parenting time with a minor child until he was approximately seven months old. Since that time, yes, he's exercised his parenting time that the parties agreed to. Abby has always been flexible in ensuring that Zach receives the maximum amount of time allotted to him. And she's agreed to additional time for him and his parents. It would now seem that her facilitation of that time has had an adverse effect on her ability to live the life she's dreamed with her husband, their child, and Jet. Zach admits that Abby has always made decisions that are in Jet's best interest. In addition, other than Zach's court-ordered child support, Abby bears all expenses incurred on Jet's behalf. Abby sought out, interviewed, and hired Jet's caretakers. Abby solely covers the expense of those caretakers, whether they're used on her own parenting time or during Zach's parenting time. She's gotten to know the individuals caring for Jet and has established personal relationships with them. Zach has little communication with Jet's caregivers, limited to pick-ups and drop-offs. Abby chose Jet's pediatrician and solely bears the expense of his health care. Although Zach was aware of all of Jet's doctor's appointments, he never attended one. Abby chose Jet's dentist and solely bears the expense of his dental care. The first dentist appointment that Zach attended for Jet was in September of 2016, one month prior to trial. Although Zach was aware of all of Jet's previous dentist appointments, he did not attend. Abby registered Jet for preschool and solely bears the expense of his education. Zach and Abby both attended Jet's first day of preschool. Other than that first day of preschool, Zach has had minimal communication with Jet's teacher. Abby has regular contact with her, anywhere from one to two days per week. Abby registered Jet for running clubs, swimming lessons, and soccer, and solely bears the expense of all of those activities. Zach did attend some of those activities, but not all. Abby attends church regularly with Jet, and Jet was baptized in her church. Abby did invite Zach and his family to the baptism, and they attended. However, Zach does not attend church and hasn't since 2006, when he was previously married. Again, there's so much more to parenting than exercising parenting time. This factor should be given substantial weight. The circuit court erred by finding that a reasonable parenting time schedule must be established that maintains Zach's current level of involvement with Jet. When addressing this factor, the circuit court held that it couldn't fashion a parenting time schedule that maintains a level of involvement for Zach in Jet's life. That standard is incorrect and erroneous. The Illinois Supreme Court tells us in Collingborn that the question is whether it would be possible to devise a visitation schedule that preserves and fosters the child's relationship with the noncustodial parent. Reasonableness is the objective, not the preservation of status quo. The 4th District Smith case says that any removal will have an effect on the noncustodial parent's visitation. This does not mean that removal should be denied, as long as a reasonable and realistic schedule can be created. The quality of a parent-child relationship need not be adversely affected because that relationship becomes a long-distance one. The 4th District said in the Tedrick case that if the prospect of a reduction in the frequency of visitation were a sufficient reason to deny a petition for removal, then almost all such petitions would have to be denied. Although Abby was never in a dating relationship with Zach, she sought him out during her pregnancy and after Jed's birth and ensured the establishment of the relationship between Jed and Zach. She agreed to extensive visitation requested by Zach, without the necessity of contested litigation, and has fostered and facilitated that time, as well as the relationship between them since the appearancing agreement was entered. Zach objects to the relocation because he wants to be in a day-to-day relationship with Jed. However, this preference is insufficient to chain Abby to the state of Illinois. Abby proposed a parenting time schedule in which Zach and Jed would not go more than 4 weeks without seeing each other. The schedule includes weekend time when Zach would not be working and coincides with his state holidays off of work. It also includes long periods during school breaks and a majority of the summer during which Zach could get Jed involved in sports and activities and be involved as well. Zach can provide a safe and loving home environment during these long visits away from Abby and there is no evidence presented to suggest that such extended time would be against Jed's best interest. In addition, although it cannot take place of in-person parenting time, technology today is such that Zach and Jed can't have face-to-face contact daily. There is no evidence to suggest that their relationship would somehow be diminished if relocation were allowed. Of course, if Abby's relocation were granted, Zach would not enjoy the same amount and frequency of parenting time that he gets now. However, Abby has always facilitated time and contact between Zach and Jed and intends to continue to do so. Surely it would be improper that her facilitation of extensive time and contact between Zach and Jed now be held against her. There is no valid evidence presented that suggests that the relationship will grow weaker if the court were to fashion a new parenting schedule upon allowing Abby to move to North Carolina. In fact, it's possible to fashion a schedule that would preserve the relationship between them. Finally, the circuit court failed to properly analyze the facts with regard to the presence or absence of extended family at the existing location and at the proposed new location. The Fourth District stated in Ford v. Martinis that the effect of the removal on the child's contact with his grandparents is a valid consideration, but when weighed against other factors should not prevent removal. The circuit court in our case ruled that Peoria is the core of extended family and that the proposed new location in North Carolina doesn't have that, so that factor clearly favors the child to stay in Peoria. However, the court failed to properly analyze the facts with regard to this factor. Zach's parents reside two hours from Peoria and there is some question as to how often they see Jed. They were not called as witnesses. While they do likely have a good relationship with Jed, there's no reason to suggest that they cannot continue to have contact with him during Zach's parenting time and otherwise electronically. Abby's mother testified that her and her husband see Jed often, although they do not reside in Peoria either. Abby's mother anticipates that if Jed resides in North Carolina, she'll be able to see him every four to six weeks. She's retired and she will be able to travel. The circuit court erred in finding that this factor clearly favors the denial of relocation. No evidence was presented that shows that Jed would be disadvantaged or harmed by changing contact with his grandparents so as to make this a determinative factor. While this factor alone may not favor relocation, it should be given little weight. May I have a moment to conclude? The evidence in this case when considering all statutory factors and giving the proper amount of weight to each clearly establishes that relocation is in Jed's best interest. The decision made by the circuit court was against manifest weight of the evidence. Therefore, for the reasons stated, Abby Daly respectfully requests that this court reverse the order of the circuit court denying her petition. Thank you, Counsel. Thank you. May it please the Court, my name is Louis Melo and I am the attorney for the appellate respondent, Zachary Upton. The respondent is asking this court to affirm the circuit court's decision. The record shows that after considering all of the statutory factors and giving each its appropriate consideration, the trial court's determination was not against the best interest. The court's determination that it was not in Jed's best interest to temporarily relocate to North Carolina was not against the manifest weight of the evidence and that the petitioner failed to meet her burden of proof. We are asking this court to decline the mother's request to re-weight the evidence or assess the credibility of the testimony and set aside the court's determination simply because she believes a different conclusion could have been drawn from the evidence. The evidence below with respect to the various statutory factors does not unequivocally support the mother's claim that the trial judge's denial of removal was against the manifest weight of the evidence. Those statutory factors are set out in section 6092G of the Illinois Marriage and Disclosure of Marriage Act, which is incorporated through the Parentage Act. I will not repeat those factors. They are enumerated and are brief. We would also submit that the trial court was free to give whatever weight it deemed was appropriate for those under the circumstances to those factors. The circuit court promptly declined to accept Abby's invitation to submit Jed to Abby's grand experiment with a virtual stranger, dragging Jed to a state far away from those who have built strong bonds with Jed that include Jed's father, two sets of grandparents, paternal and maternal, stepmother, step-siblings, Isaac and Kayden, caregivers and babysitters like Lisa Tilson and Rebecca Mines, school and neighborhood friends. No relatives other than Abby, a stepfather, and one step-sibling would live in North Carolina. Kyle has never parented Jed or lived with Jed and has spent very little time with him, not more than seven or ten days at a time. And he's really not residing with Abby in Illinois here. The trial court also gave appropriate consideration to the likelihood that Zach's close father-son relationship would suffer if Zach could not see his son on a weekly and regular basis. Preserving Jed's relationship with his father was an important factor for this court. Relocation of Jed would negatively impact Zach's normal visibility to his son. Zach has been exercising visitation, what we now call parenting time, with Jed since at least July of 2013 and when Jed was less than six months old. Zach gets three overnight nights with Jed every week and a week and every other week, beginning Friday evening and ending Sunday evening. And then he gets alternating holidays. Zach has Jed about 49% of the time and Abby has Jed about 51% of the time. Zach attends various activities that Jed is involved in, like the Illinois Valley Striders, happy feet soccer, swim lessons. And Zach has bedtime rituals with Jed, like singing a song and reading a book. He has a morning routine of getting him dressed, a structure that Jed has grown accustomed to. Zach has attended a dental appointment, as you've heard, and he takes Jed and drops him off at the preschool, I mean Latchkey. There is no dispute that Zach has a good relationship with Jed. The substitution of intermittent, extended periods of parenting time for Zach's daily or nearly daily contact with his son will reduce real-time opportunities for meaningful interaction between father and son and invariably weaken their bond. Technology will be a poor substitute for in-person contact for a child the age of Jed. And Abby can see so much in her reply brief at page 11 stating that, quote, although technology cannot substitute for in-person time, it would definitely help supplement any lost time, close quote. There have already been difficulties with the Google scheduling and inputting and all that, even here in Illinois. So we would suggest that in contrast, Kyle, the stepfather, has only seen Jed about four or five times in 2014 and 2015 and less than that in 2013 and 2016. A marriage license and an unplanned pregnancy is not an automatic license to remove a child from this state. In reference to the time when parents needed to move on who had a child, our second district appellate court got it right in a recent decision in in-rate parentage of PD. When the concurring justice said that, quote, primary concern, however, is that the custodial parent not pursued his or her individual happiness at the expense of the child's relationship with the non-custodial parent, close quote. We would submit that there is little evidence that Abby subordinated her desire for happiness to the best interest of her son. She knew or she should have known that entering into a relationship with a person whose address had changed multiple times prior to deciding to get married was increasing the chances she would need to relocate. The court properly rejected Abby's manufactured circumstances that she insists compel her to seek removal of Jed to North Carolina. She asked the court below, and this court, to ignore the duress of evidence that any effort was expended to inconvenience her new maid and explore the possibility of redeployment to a base either in Illinois or closer to Illinois. Wouldn't it be easier for Kyle to come live in Illinois rather than uproot Jed and move him to North Carolina? Instead, Abby is banking on Jed's resilience and perceived capacity to make new friends apart from a secure home base of family and extended family here in Illinois. Abby prefers to disrupt Jed's comfortable and secure life here in Illinois for her own happiness. Justin Hutchinson's statement in Henry Parentage, a PD, to defect that, quote, happiness pales in comparison to the best interest of the child when the child is separated by a distance from a parent who has been involved in the child's day-to-day activities and the extended family members who have also nurtured the child since birth, close quote. That is the case here. At the time of the removal hearing, Abby's relationship with Kyle was really in its infancy in terms of actual number of days that they were together. And then Abby reminds us that she and Kyle plan to move back to Illinois when he retires around September of 2022 to be closer to his family. Central Illinois is where his family is located. About the time Jed gets adjusted to his new life in North Carolina in a year or two, Abby and Kyle will be starting the process of returning to Illinois. That's assuming, of course, that Kyle is not deployed in a military mission in the interim or deployed to a different base where Jed will have to establish relationships and stability. Again, it begs the question, why let Jed move in the first place? And the better life or enhanced life for Jed in North Carolina is really smoke and mirrors. The trial court was not persuaded that Jed's quality of life would be markedly enhanced in North Carolina relative to Illinois. For example, the finely tuned arrangement between Zach's work schedule and Abby's work schedule and the intended benefits to Jed cannot be replicated in North Carolina. Zach and Abby coordinate their parenting time based on their work schedules. In other words, Jed enjoys the benefits of Zach and Abby's closely aligned work schedules, which maximizes the amount of quality parenting time that he has with both parents. In contrast, the evidence is that Kyle's work hours will be 6 a.m. to 6 p.m. with work days between 5 to 7 days a week under normal circumstances and an occasional overnight in the field. Really too early to drop Jed off to school and really too late to pick up Jed from school. And that's assuming that Kyle even comes home that day. Remember, there is no support system in existence in North Carolina other than the stepfather at the point of the hearing. And then any improvement in Abby's financial circumstances is at best exaggerated and will not significantly improve by the move to North Carolina. For example, unless Abby becomes a stay-at-home mother, her monthly daycare expenses will rise significantly both for her new child and for Jed, and she will have to assume to pick up and drop off costs that Zach has been previously absorbing here in Illinois for his time. By her own estimates, it will cost her several thousand dollars each year in airfare and fuel to transport Jed back and forth from North Carolina to Illinois and back and forth. Abby may not be employed, and if she does obtain employment, as she speculates, and it is speculation, it will likely pay less than what she's getting here now, given her seniority would be lower. The best that can be said is she will make a lateral move to a position in North Carolina. We can't forget that Abby's current husband would have no legal responsibility to contribute any of his income to Jed. And that income may be devoted to their new child that you just heard of. Any economies of scales would be limited to the cost of housing and food expenses, which have limitations on ceilings themselves. And there is no evidence in the record that Jed's preschool and eventually regular schools will be any better in North Carolina than they are here in Illinois. With two children to care for and no concrete job offer, it is a misrepresentation for Abby to assert that Jed will be better off in North Carolina than Illinois. And then the primary custodial parent's judgment on removal does not supersede the court. And you've heard a lot about that. When Abby cites the Zumbripa Gesundheit for the implicit proposition that a trial judge should defer to the custodial parent's decision regarding her child and any decision to move that child, it's hard to know whether to say bless you or shame on you. Abby appears to be asserting that because she has been the primary caregiver for Jed and has more wealth than Zach, she should have special privilege and make whatever change she deems are appropriate for her son without the meddling of the father or the courts. Abby says, quote, why now? Would he, Zach, or this court assume that this, the removal decision, is not in Jed's best interest? Close quote. Let the reply read from page four. Abby seems offended that this court, let alone Zach, would dare to question her decision to relocate to North Carolina with her son or if she should need permission to do so. Abby asserts that, quote, Abby's interest in moving to North Carolina should not be subordinated to Zach's interest in having day-to-day contact. Close quote. That's a reply brief page five. The reasons that the court makes the decision not to parent with primary custody are manifold. The decision to relocate with a child a thousand miles away from the other child's parents is not the pedestrian routine decision that a custodial parent makes every day. Abby does not have the only parenting time with Jed, has not made every child-rearing decision for Jed. For example, on the registration for preschool, she had to be prompted by Zach. Zach is not an absentee father, but a very involved parent to Jed. The courts are empowered and required by law to apply the statutory factors to determine what really would be in the best interest of the child in removal or relocation situations. And that's exactly what the trial judge did below. Abby argues that because Zach thinks highly of Abby's parenting decision and extrapolates that to her marriage to Kyle, her decision should be automatically adopted by the court. We believe the court below would disagree with that. Preserving Jed's relationship with his extended family in Illinois was also an important factor for the court below. Of course, over the course of a year, Jed sees his maternal grandparents about once a month and Jed loves them.  But as you heard, his maternal grandmother will only see him about every six weeks and that's if she travels out there to see him in North Carolina. Zach's sister and Glen Carbon and brother Elmhurst occasionally see Jed and it is important for Jed to maintain bonds with his extended family and that was an important consideration to the court below and clearly weighed in favor of not removal. The quality of Jed's life will not be improved by losing his regular and close contact with his extended family. If relocation of Jed were allowed, Jed will interact with his father less personally and less often, travel a long distance to have time with his father, and he will be isolated from most of his extended family and network of family and friends. The travel burden on a young child will also take its toll. None of this could serve Jed's well-being. The circuit court understood this and denied removal and relocation to North Carolina. The court below concluded that after carefully reviewing the evidence in light of the statutory factors, that Abby did not meet her burden and we submit the court's decision was not against the manifest way of the evidence and should be affirmed by this court. If there are any questions, I think I may have some time. Thank you, counsel. Counsel, you may proceed. Thank you. Just a few points. Opposing counsel indicated that Kyle was a virtual stranger for Abby. We know from the facts presented in this case that that is not the case. They've been dating since May of 2013 and although that relationship may be a long-distance relationship, it is quite an extensive relationship. They have visited with one another. And Kyle met Jed before Zach met Jed. So Kyle has been a part of this family for quite some time. Opposing counsel points out that Kyle has never parented Jed or resided with Abby. Traditionally, back a while ago, it was tradition for spouses not to reside together prior to marriage. And obviously, prior to this marriage, they didn't. And they aren't going to be able to until the court allows her to relocate. Kyle has never parented Jed. That's correct. In home, he has never parented Jed. But most parents don't parent until they become parents. So he hasn't had the chance yet to parent Jed. Opposing counsel discusses the rituals and routines that Zach has with Jed. And certainly, those are very important. Those routines and rituals can be continued during his parenting time, the proposed parenting time that Abby has set forth. Kyle does not have the ability to move to Illinois. He's stationed in North Carolina, and he will not be able to move back. He's a Marine, and he's stuck there pretty much until he retires in September of 2022. All the evidence presented by the witnesses that for... He's going to be stationed there. I thought the testimony was he may be moved somewhere besides there. It could be possible. However, Kyle did testify that his commanding officers are sensitive to the situation and do understand that he's married with a family. And he would have some leniency that way. And so he is hopeful that they would keep him stationed there. All evidence presented by the witnesses set forth that Jed is... But the military could be deployed. That's correct. He could. That is always a possibility. All evidence presented by the witnesses set forth that Jed is adaptable and outgoing. And the circuit court found in the ruling that he'd be just fine in North Carolina. Opposing counsel argues that there's no proof that the financial circumstances of Abby would be any better in North Carolina. However, she will move from a one-income home to a two-income home. Why wouldn't she... If her current husband is stationed outside of Illinois, wouldn't he still be contributing to their household in Illinois? Sure. To have a child together and he could maybe even live on base? Yes, that's correct. I'm sure he is absolutely contributing financially to them right now. However, they're living in two separate households. At this point, they're having to pay for two separate households. So in this situation, Abby could move and they could live under one roof together with their finances combined. Evidence was presented regarding the school of the circuit court and that the circuit court found in the ruling that a good quality education could be had by Jed at either location. Opposing counsel discussed that Jed sees Zach's family once per month. And as you can see in the proposed parenting plan set forth by Abby, there is visitation with Zach once per month. And there's no reason why he could not see his grandparents during that time as well. I would like to point out that the Collingborn case sets forth again that if the direct benefits that affected children were considered, if only the direct benefits that affected the children were considered, rarely would a situation arrive where removal would be permitted, where children were in a good environment with good schools, good parents, and good friends. We do have that here. Jed is in a good environment. He's in a good school and he has good friends. He has a wonderful family. But we cannot consider just the direct benefits to Jed. The indirect benefits by him that will be had by the removal to North Carolina must be considered and are very important in this case. I would just reiterate, Your Honors, that the evidence when considering all of the statutory factors and giving the proper amount of weight to each factor, considering the circuit court's ruling, the evidence clearly establishes that relocation is in Jed's best interest. Abby respectfully requests that this court reverse the order of the circuit court. Thank you, Counsel. Thank you. The court will take this case under advisement, and I will take a break for panel discussion. All right. The court is standing in recess.